**THE LAW OFFICE OF RENÉ MYATT**
204-04 Hillside Avenue, 2nd Floor
Hollis, New York 11423
(718) 468-3588
RENÉ MYATT, ESQ. (RM-4406)
Attorneys for Sean Hill
Judgment Creditor

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Hearing Date: February 10, 2011
Hearing Time: 10:00 a.m.

-----------------------------------------------------------------X

In Re

Case No.: 10-15981-SCC

NATHANIEL AJUNWA and REGINA AJUNWA,

Chapter 13

Debtors.

-----------------------------------------------------------------X

### AFFIRMATION IN OPPOSITION TO DEBTORS' NOTICE OF MOTION RETURNABLE FOR JANUARY 13, 2011 SEEKING AN ORDER PURSUANT TO 11 U.S.C. §522(f) TO AVOID THE JUDICIAL LIEN OF SEAN HILL

I, **RENÉ MYATT, ESQ.,** an attorney duly admitted to practice law before the

Courts of the State of New York, and admitted to practice within the United States Bankruptcy

Court, Southern and Eastern Districts of New York, affirms the truth of the following pursuant to

CPLR § 2106:

1. I am the attorney of record for the Secured Creditor, **SEAN HILL** ("Mr. HILL").

2. I make this affirmation upon information and belief. The source of my information and

   the basis of my belief are the records and files maintained by THE LAW OFFICE OF

   RENÉ MYATT, which I believe to be true and correct.

3. This affirmation is submitted in opposition to debtors – **NATHANIEL AJUNWA and**

   **REGINA AJUNWA's** ("AJUNWAS") motion to avoid the judicial lien of Mr. HILL.

### BACKGROUND HISTORY

4. On or about August 12, 2006, Sean Hill was involved in a dreadful motor vehicle

1

accident. The accident occurred at the intersection of Atlantic Avenue and Georgia Avenue in Kings County. Mr. Hill suffered very serious injuries, some of which included the loss of his kidney, his spleen and he remained in a coma for approximately three months. See **Exhibit "A", Copy of Summons & Complaint**

5. On September 27, 2010, a jury trial was held before Justice Robert Miller, in Kings County to address the issues of liability and damages with respect to the motor vehicle accident.

6. On October 1, 2010, after deliberation by the jury, an award was granted to Mr. Hill in the amount of FOUR HUNDRED AND THIRTY THOUSAND DOLLARS ($430,000.00) for the damages sustained by Mr. Hill as a result of the accident. Judgment was then duly entered with the Clerk of the Court on October 21, 2010. See **Exhibit "B", Copy of Judgment.**

7. The judgment creditor, Sean Hill, scheduled a deposition pursuant to New York's Civil Practice Laws and Rules ("NYCPLR") §5223 on November 12, 2010 in an attempt to ascertain how the Debtors planned to satisfy the personal injury judgment rendered after trial, to which the Ajunwas did not appear.

8. Some days after the scheduled deposition was to take place, your undersigned was served with motion papers by the Ajunwas asking to be relieved of Mr. Hill's Judgment. The Ajunwas had filed for bankruptcy on November 9, 2010, exactly 3 days before the scheduled deposition was to take place.

## ARGUMENT

## I. THE HOMESTEAD EXEMPTION DOES NOT APPLY

9. The purpose of the homestead exemption is grounded in its public policy considerations. It serves the purpose of promoting stability and making sure that families do not become public charges of the state.

10. By the debtors' own admission, to wit: their Voluntary Petition and their testimony at the Creditors Meeting, the debtors are substantially without debt and are not in danger of becoming public charges of the state.

11. The danger in not becoming a public charge is evident based on the statements made by the debtors. First, the Ajunwa Debtors are both well-established social workers, professional people who are owners of a two-family home located in Bronx County. They have owned this home for over 15 years that require minimal maintenance.

12. Second, the Ajunwas, are current with their mortgage payments and being owners of a two-family home, they accumulate rental income. By using the rental income to pay their mortgage, the Ajunwas enjoy minimal maintenance of their home, thus, freeing up their finances so that it may be applied to other expenditures.

13. Third, the annual salary of the debtors' household is consistent with that of an upper middle class family totaling close to ONE HUNDRED EIGHT THOUSAND ($108,000.00) DOLLARS a year. See **Exhibit C – Copy of Transcript of 341(a) Creditors Meeting dated December 9, 2010, p.11, ll. 5-9.**

14. Further, the Ajunwas have been able to manage the extent of their debt in such a diligent fashion that they are able to provide for the private schooling of their grandchildren. See **Exhibit C – Copy of Transcript of 341(a) Creditors Meeting dated December 9,**

3

2010, p.12, ll. 9-12

15. This Chapter 13 filing by the Ajunwas is an insult to this Court and evinces their abusive

    tactic in manipulating and taking advantage of the Bankruptcy Code as well as making a

    spectacle of the judicial system.

16. The homestead exemption does not apply because it is clear, the Debtors are in no danger

    of becoming public charges.

17. The homestead exemption, and Bankruptcy laws in general, were not established as

    a means for debtors to escape the responsibilities of paying their debts. If the

    avoidance of one's liability to his or her debts could be so easily manipulated then such

    bad faith filings would engulf Bankruptcy courts.

## II. DEBTORS' APPRAISAL IS SELF-SERVING, UNRELIABLE AND UNTRUSTWORTHY

18. The appraisal submitted by the debtors must be rejected. The comparisons found in the

    appraisal report are inapposite to the subject premises; they are not within the proximity

    of the subject premises. Moreover, the comparables include homes that have been

    "transferred" over six (6) months ago which are too remote in time. The comparables

    conducted by the undersigned show the value of the subject property is well over half a

    million dollars. See attached **Exhibit D – Comparable Search**

19. The Ajunwas' home is a two-family house located in an upper middle-class

    neighborhood in the Bronx. Based on your undersigned's real estate practice, the

    debtors' appraisal is unreliable and untrustworthy. See **Exhibit E – Appraisal Report.**

    Property such as the Ajunwas is valued at much higher prices.

20. Accordingly, based on the foregoing reasons, the undersigned objects to the Ajunwas'

appraisal report and its submission to this Court for purposes of determining the value of the property.

## III. DEBTORS HAVE FILED THIS CHAPTER 13 PETITION IN BAD FAITH

21. The Ajunwas Chapter 13 filing is clearly in bad faith as they are virtually without debt and, based on the above mentioned facts, presumably have room to free up their finances for application elsewhere. The Chapter 13 filing is specifically targeted to avoid the judgment Mr. Hill has obtained against the debtors as a result of the injuries he received from the motor vehicle accident they caused.

22. The debtors seek to avoid Mr. Hill's judicial lien in its entirety. It is abundantly clear that the Ajunwas have no intention of paying Mr. Hill's judgment as is further proven by the Debtors Chapter 13 Plan (the "Plan") submitted to this court. The purpose of filing a Chapter 13 proceeding is designed for individuals with regular income to pay their debts in installments. The Ajunwas have not even incorporated Mr. Hill, a secured creditor, in their proposed plan. To intentionally disregard Mr. Hill, the only substantial creditor, is to make a mockery of the intent and spirit of the bankruptcy law.

23. Pursuant to Bankruptcy Code, 11 U.S.C. §1322(a)(2), all Chapter 13 proceedings shall include a plan that shows how claims entitled to priority are to be repaid by the debtors. Mr. Hill holds a claim that is entitled to priority.

24. Under the debtors' current Plan, the Ajunwas have proposed a total payment plan to the Trustee in the amount of $2,431.20. See attached **Exhibit F – Chapter 13 Plan.** The debt owed Mr. Hill is not included in this plan. Therefore, the Ajunwas have transparently shown that they do not wish to participate in a search of their assets that would no doubt establish that they can fully satisfy Mr. Hill's judgment. The

Ajunwas' main goal is to wipe out Mr. Hill's judgment and they are using the Court to reach this goal.

25. Mr. Hill is entitled to payment as a Secured Creditor under the debtors' estate.

26. Furthermore, the undersigned further objects to the submission of the Plan as submitted to the Court as it fails to comply with the standard Model Chapter 13 Plan form used in the United States Bankruptcy Court, Southern District.

27. Mr. Hill, as a secured creditor, pursuant to the Bankruptcy Code and New York's Civil Practice Law and Rules is entitled to depose the Debtors in order to assess the financial condition of the debtors.

28. The debtors are attempting to hinder Mr. Hill in gathering the information needed to satisfy his judgment and the debtors are using the Bankruptcy Code as a means to achieve their end.

29. As stated earlier, Mr. Hill attempted to ascertain the Ajunwas' assets by serving a Subpoena on the debtors on October 30, 2010. See **Exhibit G – Affidavit of Service** The deposition pursuant to the NYCPLR §5223 was scheduled for November 12, 2010. The Ajunwas did not appear on the scheduled date.

30. Given the timing of the Chapter 13 filing which occurred on November 9, 2010, a few days before the scheduled deposition, coupled with the filing of the debtors' motion to avoid the judicial lien as well as the Plan, it is clear that the Ajunwas' purpose for filing this bankruptcy proceeding is to avoid the liability they have in connection with Mr. Hill in its entirety.

31. According to the Ajunwas debt to salary ratio, it is evident that the debtors have sufficient means to survive. Based on the expenditures that the debtors have cited in their petition

and schedules, it is not far-fetched to deduce that eighty to ninety percent of their annual

salary is being placed elsewhere. Both debtors are citizens of Nigeria and have strong

ties to their native country. Both have been very responsible and resourceful in being

able to maintain their financial lives. See **Exhibit C – Copy of 341(a) Creditors**

**Transcript Hearing, p. 13, ll 12-25, p. 14, ll. 8-25**

32. Now, the Ajunwas come to the court seeking to avoid Mr. Hill's judgment. Therefore,

the overall motive for the filing of this petition is for the Ajunwa Debtors to completely

escape Mr. Hill's judgment.

**WHEREFORE,** it is respectfully requested that the Debtors NATHANIEL AJUNWA

and REGINA AJUNWA's motion to avoid the judicial lien of Sean Hill be denied in its entirety

and with such further relief as the Court deems just and proper.

Dated: Hollis, New York
      January 7, 2011

                           Yours, etc.

                           THE LAW OFFICE OF RENÉ MYATT
                           Attorneys for Secured Creditor
                           **SEAN HILL**
                           204-04 Hillside Avenue, 2nd Floor
                           Hollis, New York 11423
                           (718) 468-3588

TO:

GEORGE BASSIAS, ESQ.
Attorney for Debtors
21-83 Steinway Street
Astoria, New York 11105
(718) 721-4441

JEFFREY SAPIR, ESQ
Chapter 13 Trustee
399 Knollwood Road, Suite 102
White Plains, New York 10603
(914) 328-6333

UNITED STATES TRUSTEEE
SOUTHERN DISTRICT OF NEW YORK
One Bowling Green
New York, New York 10004

**EXHIBIT "A" – Copy of Summons and Complaint**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-----------------------------------------------------------------X

SEAN HILL,

                                                    Index No. 24874/07
                                                    Date Purchased

                              Plaintiff,            Plaintiff(s) designate(s)

          -against-
                                                    County as the place of Trial
                                                    KINGS

                                                    The basis of the venue is
                                                    Plaintiff's Residence

                                                    **S U M M O N S**

NATHANIEL AJUNWA and REGINA AJUNWA,

                              Defendants.
-----------------------------------------------------------------X

TO THE ABOVE NAMED DEFENDANT(S).

          YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to
serve a copy of your Answer, or if the Complaint is not served with this Summons, to
serve a Notice of Appearance, on the Plaintiff's Attorneys within twenty (20) days after
the service of this Summons, exclusive of the date of service (or within thirty (30) days
after the service is complete if this Summons is not personally delivered to you within the
State of New York); and in case of your failure to appear or answer, judgment will be
taken against you by default for the relief demanded in the Complaint.

          Dated: Hollis, New York
                 July 3, 2007

                                        Yours, etc.

                                        Rene' Myatt, Esq.
                                        Attorney for Plaintiff(s)
                                        204-04 Hillside Avenue, 2nd Floor
                                        Hollis, New York 11423
                                        (718) 468-3588

Defendants address:
Nathaniel Ajunwa
912 E. 220th Street
Bronx, New York 10469

1

Regina Ajunwa
58 Roma Orchard Road
Peekskill, New York 10566

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
--------------------------------------------------------------------X
SEAN HILL,

                         Plaintiff,

       -against-

NATHANIEL AJUNWA and REGINA AJUNWA,

                        Defendant.
--------------------------------------------------------------------X

Index No.

**VERIFIED COMPLAINT**

verify by atty

Plaintiff, by his attorney, RENÉ MYATT, ESQ. as and for his Verified

Complaint, alleges as follows:

1. That at all times hereinafter mentioned, the plaintiff, SEAN HILL was and still is

   a resident of the Kings County, State of New York.

2. That at all times hereinafter mentioned, defendant, REGINA AJUNWA

   (hereinafter referred to as "REGINA") was and still is a resident of the county of

   Westchester.

3. That at all times hereinafter mentioned, defendant, NATHANIEL AJUNWA

   (hereinafter referred to as "NATHANIEL") was and still is a resident of Bronx

   County.

4. That at all times hereinafter mentioned, defendant Regina was the owner of a

   motor vehicle bearing New York license plate number DHY1169.

5. That at all times hereinafter mentioned, the defendant, NATHANIEL operated the

   above-described motor vehicle.

6. That at all times hereinafter mentioned, defendant NATHANIEL controlled the

   motor vehicle described above.

7. That at all times hereinafter mentioned, the defendants maintained the motor vehicle described above.

8. That at all times hereinafter mentioned, the public streets on Atlantic Avenue and Georgia Avenue in Kings County were still are much traveled public thoroughfares.

9. That at all times hereinafter mentioned, the public streets on Atlantic Avenue and Georgia Avenue in Kings County were and still are in constant use by the residents of Kings County.

10. That imposed upon the defendant REGINA as owner by law of the motor vehicle , is the duty of managing it so it will not become dangerous to those lawfully using said streets, and to those lawfully traveling on the public streets.

11. That at all times hereinafter mentioned, the public streets on Atlantic Avenue and Georgia Avenue Kings County were and still are public thoroughfares which the defendant NATHANIEL had a duty to exercise safety and due care.



## FIRST CAUSE OF ACTION

12. That on the 12th day of August 2006, the defendant NATHANIEL disregarded his duty and negligently and carelessly made an illegal U-turn on Atlantic Avenue causing the Plaintiff to strike the above-described motor vehicle.

13. That on to the 12th day of August 2006, the defendant NATHANIEL disregarded his duty and negligently and carelessly made an illegal U-turn permitting an unsafe and dangerous condition to happen.

14. That on the 12th day of August 2006, the Plaintiff, SEAN HILL, was rightfully and lawfully, in the exercise of due prudence, riding his motorcycle on Atlantic

Avenue and Georgia Avenue in King County when he was caused to strike the above-described motor vehicle driven by defendant-NATHANIEL.

15. The defendants were negligent in the ownership, operation, management, maintenance and control of the aforesaid motor vehicle; in causing, suffering, permitting and allowing the motor vehicle, to be, become, remain and create an unsafe and dangerous condition; in causing, permitting and allowing an unsafe driver to operate said motor vehicle; in failing to yield to person or persons traveling along the thoroughfare at Atlantic Avenue and Georgia Avenue in Kings County; in failing to learn the rules of the road and safe travels; in failing to warn the public of the unsafe driver behind the wheel of the above-described motor vehicle; in causing, suffering, permitting and allowing all of the foregoing to be, become and remain for a considerable period of time; in failing to be competent and well-trained in the operation of the aforesaid motor vehicle; in failing to supervise the repair of the aforesaid motor vehicle; in causing, suffering, permitting and allowing the plaintiff to be strike the above described vehicle; in failing and omitting to take proper and suitable precaution to prevent the happening of the aforesaid occurrence; in failing to remedy the aforesaid condition.

16. The defendants, its agents, servants and/or employees had constructive knowledge of all of the foregoing.

17. The Plaintiff, SEAN HILL, in no way contributed to the happening of the aforesaid occurrence which was due solely to the carelessness, recklessness and negligence of the defendant, his agents, servants and/or employees.

18. That by reason of the foregoing, the plaintiff, SEAN HILL, sustained severe and personal injuries; he was rendered sick, sore, lame and disabled and still suffers from great bodily pain and mental anguish. He was confined to his bed and home for an extended period of time; he was and still is unable to perform his usual duties and vocations; he has been caused to and continue to need hospital and medical care, aid and attention for which he has and continues to spend money; some of his injuries are permanent in nature.

19. That by reason of the negligence of the defendants, the plaintiff, SEAN HILL, has sustained serious injuries as defined in Section 5102 (d) of the Insurance Law of the State of New York and/or economic loss greater than basic economic loss as defined in Section 5102 (a) of the Insurance Law of the State of New York.

20. This action falls within one or more of the exceptions set forth in CPLR Section 1602.

21. As against the defendant, the plaintiff, SEAN HILL, has been damaged in the sum of TWO MILLION ($2,000,000.00) DOLLARS;

WHEREFORE, the plaintiff, SEAN HILL, demands judgment as follows: as against the defendants the plaintiff, SEAN HILL, demand judgment in the sum of TWO MILLION ($2,000,000.00) DOLLARS; together with costs and disbursements of this action.

Dated: Hollis, New York
July 6, 2007

Yours, etc.

RENE MYATT
Attorney for Plaintiff
204-04 Hillside Avenue, 2nd Floor
Hollis, New York 11423
(718) 468-3588

6

## VERIFICATION

STATE OF NEW YORK )
COUNTY OF QUEENS ) SS.:


     René Myatt, an attorney at law admitted to practice before the Courts of the State of New York, affirms the following to be true under penalties of perjury:


     I am the attorney of record for the Plaintiff in this action;

     I have read the annexed COMPLAINT and know the contents thereof, and the same are true based upon information and belief. My belief, as to those matters herein not stated upon knowledge are: Interviews and/or discussions had with said plaintiff and reports of investigation cause to be made by the plaintiff and/or documents which are now in affirmant's possession and other data relating thereto.

     The reason I make this foregoing verification instead of the plaintiff, because the plaintiff resides at the address indicated below:

        806 Halsey Street
        Brooklyn, New York 11233

Outside of the County where your affirmant's office is located.

Dated: Hollis, New York
      July 6, 2007

                                    _____
                                      RENÉ MYATT

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

INDEX NO.: 24874/07

SEAN HILL.

                 Plaintiff,

    -against-

NATHANIEL AJUNWA and REGINA AJUNWA,
        Defendant.

---

## SUMMONS and VERIFIED COMPLAINT

---

### SECTION 130-1.1 SIGNATURE:

RENÉ MYATT

---

RENÉ MYATT, ESQ.
Attorney for Plaintiff
204-04 Hillside Avenue, 2nd Floor
Hollis, New York 11423
Telephone: (718) 468-3588
Facsimile: (718) 468-5731

8

**EXHIBIT "B" – Copy of Judgment**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------X
SEAN HILL,

                                                          **NOTICE OF ENTRY**

                    Plaintiff(s),

                                                          Index No.: 24874/07
        -against-

NATHANIEL AJUNWA and REGINA AJUNWA,

                    Defendant(s)
-----------------------------------------------------------------X
**SIRS:**

**PLEASE TAKE NOTICE,** that a Judgment of which the within is a true copy was duly entered

on October 21, 2010 in the office of the clerk of the Supreme Court of the State of New York

County of Kings.

Dated: October 26, 2010
        Hollis, New York

                                          Yours, etc.,

                                          **RENÉ MYATT, ESQ.**
                                          Attorney for Plaintiff
                                          204-04 Hillside Avenue, 2nd Floor
                                          Hollis New York, 11423
                                          (718) 468-3588

TO:    **MONFORT, HEALY, McGUIRE & SALLEY**
       **1140 Franklin Avenue**
       **P.O. Box 7677**
       **Garden City, New York 11530**

       **Nathaniel Ajunwa**
       **912 E. 220th Street**
       **Bronx, New York 10469**

       **Regina Ajunwa**
       **912 E.220th Street**
       **Bronx, New York 10469**

Regina Ajunwa
58 Roma Orchard Road
Peekskill, New York 10566

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-------------------------------------------------------------------X

SEAN HILL,

Index No.: 24874-07

                                  Plaintiff,                **J U D G M E N T**

    -against-

NATHANIEL AJUNWA and REGINA AJUNWA,

                                   Defendant.

-------------------------------------------------------------------X

The issues in the above entitled action having duly come on for trial before Justice

Robert Miller, and a jury, at a Supreme Court, IAS Part _62_ of this Court held at the

courthouse thereof. located at 360 Adams Street; Brooklyn. New York on the 27th , 28th,

29th, of September 2010 and the 1st day of October 2010, and the Plaintiff having

appeared by his attorney, RENÉ MYATT. ESQ., and NATHANIEL AJUNWA and

REGINA AJUNWA having appeared by MONTFORT, HEALY, McGUIRE & SALLEY

by Michael Adams, Esq., and the issues having been duly tried; and during a charge

conference defendants having conceded liability on September 30, 2010 and at the end of

the entire trial on October 1, 2010, a jury on the issue of damages, having awarded the

Plaintiff, SEAN HILL the sum of $400,000.00 for past Pain and Suffering and the sum of

$30,000.00 for past Loss Earnings. the sum of zero for future Pain and Suffering; all

jurors having been polled and having affirmed the award; and , thereafter, the Plaintiff

having moved for the judgment to be entered;

NOW, upon motion by RENÉ MYATT, ESQ. attorney for the Plaintiff, it is,

ADJUDGED that Plaintiff SEAN HILL. currently residing at 806 Halsey Avenue;

Brooklyn. New York 11233, have a judgment and recover from the defendants,

NATHANIEL AJUNWA and REGINA AJUNWA, the sum of $430,000.00 with interest

thereon from October 1, 2010, the date of the verdict $ 1,877.50 , making in all

the sum of $ 431,827.50 , and that the Plaintiff have execution thereof; and it

is further,

ADJUDGED that Plaintiff have judgment and recover from the defendants

NATHANIEL AJUNWA and REGINA AJUNWA, the costs and disbursements in the

sum of $ 1145.00 , and that the Plaintiff have execution thereof.

Judgment entered this 21 day of Oct 20 10

FILED

OCT 2 1 2010

_____
CLERK
KINGS COUNTY CLERK'S OFFICE

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

SEAN HILL,                                        Index No.: 24874-07

                            Plaintiff,

        -against-

NATHANIEL AJUNWA and REGINA AJUNWA,

                            Defendant,

## JUDGMENT

### THE LAW OFFICE OF RENÉ MYATT
### 204-04 HILLSIDE AVENUE
### 2ND FLOOR
### HOLLIS, NEW YORK 11423
### PHONE: (718) 468-3588
### FAX:    (718) 468-5731

==========================================================
==========================================================

Pursuant to 22 NYCRR 130-1 1-a, the undersigned, an attorney admitted to practice in the courts of New York State, certified that
upon information and belief and reasonable inquiry, (1) the contentions contained in the annexed document are not frivolous and that
(2) if the annexed document is an initiating pleading, (i) the matter was not obtained through illegal conduct, or that if it was, the
attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee earned there from
and that (ii) if the matter involves potential claims for personal injury or wrongful death, the matter was not obtained in violation of 22
NYCRR 1200 41-a

Dated:  Hollis, New York _October 18, 2010_

Signature _René Myatt_

Print Signer's Name: René Myatt

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
SEAN HILL,

                                            NOTICE OF ENTRY

                Plaintiff(s),

                                            Index No.: 24874/07

     -against-

NATHANIEL AJUNWA and REGINA AJUNWA,

                Defendant(s)
------------------------------------------------------------------X
==================================================================

## **NOTICE OF ENTRY**

==================================================================

Pursuant to 22 NYCRR 130-1.1-a, the undersigned, an attorney admitted to practice in the courts of New York State, certified that upon information and belief and reasonable inquiry, (1) the contentions contained in the annexed document are not frivolous and that (2) if the annexed document is an initiating pleading, (i) the matter was not obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee earned there from and that (ii) if the matter involves potential claims for personal injury or wrongful death, the matter was not obtained in violation of 22 NYCRR 1200.41-a.

Dated:        Hollis, New York *October 26, 2010*

Signature:      _____

Print Signer's Name: René Myatt_____

**EXHIBIT "C" – Copy of Transcript of 341(a) Meeting**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------X

IN THE MATTER OF:

                              Case No. 10-15981
                            (Jeffery L. Sapir)

    NATHANIEL AJUNWA
    AND REGINA AJUNWA,

        Debtors.


-------------------------------X

               341 HEARING

               December 9, 2010

HELD AT:           OFFICE OF THE UNITED STATES TRUSTEE
                 New York, NY

BEFORE:            JEFFERY L. SAPIR
                 Trustee

APPEARANCES:      GEORGE PASIAS, ESQ.
                 Counsel for the Trustee

                 RENE MYATT, ESQ.
                 Counsel for the Creditors

                 MR. TAYLOR LLOYD, ESQ.
                 Counsel for the Creditors

```
                    I N D E X

                                    RE        RE      V.
WITNESS         DIRECT    CROSS   DIRECT    CROSS    D.      J


                    E X H I B I T S

                                                    For    In
PETITIONER              DESCRIPTION                 I.D.   Ev.



RESPONDENT             DESCRIPTION           I.D.      IN EV.
```

TRUSTEE JEFFERY SAPIR:  Okay, this is track no. 19.  It's in the matter of Nathaniel and Regina Ajunwa.  You want to raise your right hands please? Solemnly swear to tell the truth, the whole truth, and nothing but the truth, so help you God.

MR. NATHANIEL AJUNWA:  I do.

MS. REGINA AJUNWA:  I do.

MR. SAPIR:  State your name and your address please.

MR. AJUNWA:  Nathaniel Ajunwa, 912 East 220th Street, Bronx, New York 10469.

MS. AJUNWA:  Regina Ajunwa, 912 East 220th Street, Bronx, New York 10469.

MR. SAPIR:  Counsel.

MR. GEORGE PASIAS:  George Pasias [phonetic], admitted to the Southern District.

MR. SAPIR:  Creditors.

MS. RENE MYATT:  Yes, Rene Myatt, 204-04 Hillside Avenue, Hollis, New York 11423.

MR. TAYLOR LLOYD:  Taylor Lloyd [phonetic], 204-04 Hillside Avenue, second floor, Hollis, New York 11423.

MR. SAPIR: Okay, any other creditors --? I show you this petition and supporting schedules where my thumb is. Is that your signatures?

MR. AJUNWA: Yes.

MS. AJUNWA: Yes.

MR. SAPIR: And the statements that you made, were they true and correct to the best of your knowledge?

MR. AJUNWA: Yes.

MS. AJUNWA: Yes.

MR. SAPIR: Okay, for the record I've verified that as picture IDs by the New York State Driver's Licenses, Social Security numbers from their Social Security cards. Have you folks owned any real estate in the last six years?

MS. AJUNWA: Bought the house that's in--

[crosstalk]

MR. SAPIR: I'll try to give them my input. That's the place where you reside, right? Okay. And that's the house at 912 East 220th Street in the Bronx?

MR. AJUNWA:  Yes.

MS. AJUNWA:  Yes.

MR. SAPIR:  And that's a two-family
house?

MS. AJUNWA:  Yes.

MR. AJUNWA:  Yes.

MR. SAPIR:  And the house is owned in
joint names?

MS. AJUNWA:  Yes.

MR. AJUNWA:  Yes.

MR. SAPIR:  Have you owned any stocks,
bonds, and/or mutual funds in the last year?

MS. AJUNWA:  No.

MR. AJUNWA:  No.

MR. SAPIR:  IRA's, Keyos [phonetic],
401Ks, 403Bs?

MS. AJUNWA:  No.

MR. AJUNWA:  No.

MR. SAPIR:  Any bank accounts, check or
savings?

[crosstalk]

MR. SAPIR:  You have a 401K at work? And
somebody has an IRA?

MS. AJUNWA:  Yes.

1

2          MR. SAPIR:  You have the IRA?

3          MS. AJUNWA:  Ahum.

4          MR. SAPIR:  Okay.  And you have an

5      annuity at work also, correct?

6          MS. AJUNWA:  Yes.

7          MR. SAPIR:  Have you had any bank

8      accounts, either check or savings within the

9      last year?

10         MS. AJUNWA:  Yes.

11         MR. AJUNWA:  Yes.

12         MR. SAPIR:  Which bank?

13         MS. AJUNWA:  I have two - -

14         MR. AJUNWA:  Chase, and I have Citibank.

15         MR. SAPIR:  Okay, so there's a Chase and

16     Citibank?

17         MR. AJUNWA:  Yeah.

18         MR. SAPIR:  Okay, they both in joint

19     names? Or was it one account in your name and

20     one account in her name?

21         MR. AJUNWA:  One account in her name.

22         MR. SAPIR:  Okay, so the Chase account

23     is in your name?

24         MR. AJUNWA:  - -

25         MR. SAPIR:  And the Citibank is in

husband's.  Counsel, you should check--

MR. AJUNWA:  Joint.

MS. AJUNWA:  Joint.

MR. SAPIR:  It's joint.

MR. AJUNWA:  Ahum.

MR. SAPIR:  Both of them?

MR. AJUNWA:  Ahum.

MR. SAPIR:  Okay.

MR. AJUNWA:  - -

MR. SAPIR:  The Citibank is joint?

MR. AJUNWA:  Is joint.  - - is not joint.

MR. SAPIR:  Okay.  That's where she keeps all her private money.  Okay.  Have you owned a vehicle within the last year?

MR. AJUNWA:  Yes.

MS. AJUNWA:  Yes.

MR. SAPIR:  What's the make and model?

MR. AJUNWA:  2002 - -.

MR. SAPIR:  Okay, is that owned by you free and clear?

MR. AJUNWA:  Yes.

MR. SAPIR:  Within--let me ask you this; did you file your 2009 federal and state

income taxes?

    MR. AJUNWA:  Yes we did.

    MS. AJUNWA:  Yes.

    MR. SAPIR:  Did you ask for a refund?

    MR. AJUNWA:  Yes we did.

    MR. SAPIR:  Approximately how much did you get back and when did you get it?

    MR. AJUNWA:  Approximately 4,000 and some change.

    MR. SAPIR:  Okay.  And approximately when did you get it?

    MR. AJUNWA:  About January.

    MR. SAPIR:  Okay, so you filed it right away and then you got it?

    MR. AJUNWA:  Ahum.

    MR. SAPIR:  Counsel, did you file a claim, cause I don't see a copy of a claim.

    MR. PASIAS:  Yeah, I did, I did.  This is the claim, it's filed.

    MR. SAPIR:  This is not an official claim.  You've got to go onto the website, court's website, and use the official claim. Technically this is not a claim.

    MR. PASIAS:  Okay, I'll go on the

court's website.

MR. SAPIR:  Yeah, there's an official form.  Yeah, there's an official Southern District form.

MR. PASIAS:  Okay.

MR. SAPIR:  Within the last year has anyone died and left you any inheritance?

MR. AJUNWA:  No.

MS. AJUNWA:  No.

MR. SAPIR:  Might you be the beneficiary under any will or any trust that you know of?

MR. AJUNWA:  No.

MS. AJUNWA:  No.

MR. SAPIR:  Counsel, on Schedule C, although it's minimal, but you're going to have to amend.  You claim cash and you can't claim a homestead exemption at the same time, so take the cash out.  It's not going to make a difference, but we got to take it out. Otherwise I have to object to it.

MR. PASIAS:  Which cash?

MR. SAPIR:  You claimed $200 cash.  The checking.

MR. PASIAS:  All right, no problem, I'll

change it.

MR. SAPIR:  It's just a formality.  All right, schedules state that Mr. is employed by the Services for the Underserved.

MR. AJUNWA:  Yes.

MR. SAPIR:  And Mrs. is employed by Harlem United Community Aids.

MS. AJUNWA:  Yes.

MR. SAPIR:  Okay.  And Mr., what do you do for your employer? What's your occupation? What do you do for a living?

MR. AJUNWA:  I'm a social worker.

MR. SAPIR:  Social worker, okay.  And Mrs., what do you do for your employer?

MS. AJUNWA:  I'm also a social worker.

MR. SAPIR:  Social worker, okay.  How old is the son, because we have to have ages. Don't give me names, but how old is the son?

MS. AJUNWA:  Twenty.  The youngest?

MR. SAPIR:  I don't know, it says all you have is one son and one daughter.

MS. AJUNWA:  Yes, twenty years old.

MR. SAPIR:  Twenty.  And how old is the daughter?

2          MR. AJUNWA:  Twenty-five.

3          MR. SAPIR:  Twenty-five, okay.  And

4      they're both living at home?

5          MS. AJUNWA:  Yes.

6          MR. SAPIR:  Okay.  According to the

7      schedules, you both take home about just

8      under $4,500 per month, is that correct?

9          MR. AJUNWA:  That's right.

10          MR. SAPIR:  And how much is the monthly

11      mortgage payment?

12          MR. AJUNWA:  $1,674.76.

13          MR. SAPIR:  Does that mortgage payment

14      include the real estate taxes?

15          MR. AJUNWA:  Yes.

16          MR. SAPIR:  How about homeowner's

17      insurance?

18          MR. AJUNWA:  Yeah, it's included.

19          MR. SAPIR:  Included.  Gas, electric,

20      and heat fuel runs you about $300 a month?

21          MS. AJUNWA:  Yes.

22          MR. SAPIR:  Food bill runs you about

23      $400 a month.

24          MS. AJUNWA:  Yes.

25          MR. AJUNWA:  Yes.

MR. SAPIR:  Transportation runs you, if I could see it, 180?

MS. AJUNWA:  Yes.

MR. AJUNWA:  Yes.

MR. SAPIR:  Car insurance is $300 a month? You have to say yes or no.

MR. AJUNWA:  Yes.

MR. SAPIR:  Okay, and you have to pay for the grandchildren's schooling?

MR. AJUNWA:  Yes.

MS. AJUNWA:  Yes.

MR. SAPIR:  Yeah, I know, but it's grandchildren.  I have a problem with that, but maybe they have a problem with it also. But that's just a gratuitous payment. There's nothing that obligates them to make that payment.  And how did you folks get into your financial difficulties?

MR. AJUNWA:  I had an accident and I was - -

MR. SAPIR:  Okay.  Did you have insurance at the time?

MS. AJUNWA:  Yes.

MR. SAPIR:  Okay.

MR. PASIAS: He had a minimal policy.
That got a 430,000 excess verdict.

MR. SAPIR: Okay. Creditor, any
questions?

MS. MYATT: I have a number of
questions, but apparently I'm going to have
to - -

MR. SAPIR: [interposing] Right on 2004,
right. Well you can ask a couple, I'll give
you a couple. So give me your two best.

MS. MYATT: My two best. Are you folks
still citizens in Nigeria?

MR. AJUNWA: No.

[crosstalk]

MR. AJUNWA: Yes, yes, yes.

MS. MYATT: Okay, do you own property in
Nigeria?

MR. AJUNWA: No we don't.

MS. MYATT: One more.

MR. SAPIR: Okay.

MS. MYATT: Do you have family in
Nigeria?

MR. AJUNWA: Her mother, yes.

MS. AJUNWA: My mother - -

MS. MYATT: You only giving me those

three?

MR. SAPIR: You want to get another good

one?

MS. MYATT: You know I do.

MR. SAPIR: Okay, all right, go ask it.

MS. MYATT: Did your mother live in a

home in Nigeria?

MS. AJUNWA: No.

MS. MYATT: Excuse me?

MR. AJUNWA: No, no, no.

MS. MYATT: She lives in an apartment or

she lives in a house?

MR. AJUNWA: She lives in an apartment.

MS. AJUNWA: An apartment.

MS. MYATT: An apartment?

MR. AJUNWA: In the village, yes.

MS. MYATT: She pays rent or it's

something she owns?

MS. AJUNWA: - - A small house where

they have been living for years.

MS. MYATT: Okay, does she own that

house?

MS. AJUNWA: Yeah.

1

2          MS. MYATT:  Okay, are either of you co-

3    owners of that property?

4          MS. AJUNWA:  No, no.

5          MS. MYATT:  Do you have any bank

6    accounts in Nigeria?

7          MS. AJUNWA:  No.

8          MR. SAPIR:  Okay, so you can ask for the

9    rest of the 2000 report.

10         MS. MYATT:  I appreciate it.

11         MR. SAPIR:  Okay.

12         MS. MYATT:  Thank you sir.

13         MR. SAPIR:  All right, so I have no

14   further questions, and I'm going to close the

15   meeting.  Okay.

16         [END OF HEARING]

# C E R T I F I C A T E

I, Walter Baker, certify that the foregoing transcript

of proceedings in the Bankruptcy Court of the 341

Hearing of Nathaniel Ajunwa and Regina Ajunwa, Case

No. 10-15981 was prepared using standard electronic

transcription equipment and is a true and accurate

record of the proceedings.


Tape #1019

Counter #s ___N/A_____ to _____

Signature: *Walter Baker*

Date: December 22, 2010

ERRATA SHEET FOR TRANSCRIPT OF _____

RE: _____  DATE TAKEN: _____

PAGE     LINE #      CORRECTION        REASON

_____

WITNESS' NAME

SUBSCRIBED AND SWORN TO THIS

_____ DAY OF _____, 200____

_____

**Ubiqus/Nation-Wide Reporting & Convention Coverage**
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

**EXHIBIT D – Comparable Search**

# New York City Buildings Comparable Sales Search for: 912 E 220 St
## Property Type: Two family Brick (B1)


Shark

### Current search criteria

- Zip code: 10469
- Sales within the last 6 months
- Two Families

### Search results statistics

| | |
|---|---|
| Number of properties found: | 3 |
| Low price: | $109,000 |
| High price: | $529,608 |
| Median price: | $525,000 |
| Median Price per SF: | $190 |
| Median Gross SF: | 2,668 |
| Value of subject property at Median Price per SF: | $403,750 |

| Address | Seller & buyer | Building Class Time held | Date closed Transfer type | Distance Year built | Gross SF Bldg dimensions | Price per SF Neighborhood | Price/land SF Zip code | Sale price |
|---|---|---|---|---|---|---|---|---|
| 912 E 220 St | Waithe, Florence to Ajunwa, Nathanial | Two family Brick (B1) n/a | 3/1/1993 (recorded) No sale price | 0.00 1960 (estimated) | 2,125 20 ft x 37 ft | n/a Williamsbridge, Olinville | $0 10469 | n/a |
| 2573 Laconia Ave | Fox, Claire to Alhumadi, Siddek S | Two family Miscellaneous (B9) n/a | 5/12/2010 Normal | 1.16 1940 (estimated) | 2,495 20.67 ft x 38 ft | $210 Allerton, Pelham Gardens | $229 10469 | $525,000 |
| 2556 Hone Ave | David Lesch, Es Q. Referee to Homesales, In C | Two family Brick (B1) 2yrs 9mo | 5/17/2010 Normal | 1.20 1935 (estimated) | 2,784 18 ft x 46 ft | $190 Allerton, Pelham Gardens | $211 10469 | $529,608 |



# 1133 Waring Ave

Demiroska, Fatime And
Mamudoski, Aida And
Demiroski, Idaver to
Demiroski, Idaver

Two family Brick (B1)    3/9/2010

10yrs 4mo    Normal

1.43
1940 (estimated)

2,668
23 ft x 58 ft

$40
Allerton, Pelham
Gardens

$31
10469

$109,000

**EXHIBIT E – Appraisal Report**

RESIDENTIAL APPRAISAL REPORT
OF A 2 FAMILY RESIDENCE AS OF OCTOBER 1, 2010
LOCATED AT:

912 East 220th Street, Bronx, NY 10469-Ajunwa
249328

PREPARED FOR:

George Bassias, Esq
2183 Steinway Street
Astoria, NY 11105

PREPARED BY:
East Coast Appraisal Service
50 Court Street
Suite #508
Brooklyn, NY 11201



EASTCOAST
APPRAISAL SERVICE
E-mail: info@eastcoastappraisal.com
50 Court Street, Suite 508, Brooklyn, NY 11201
Phone: 718-834-8700 Fax: 718-834-8807

October 1, 2010

Mr. George Bassias, Esq.
2185 Steinway Street
Astoria, NY 11105

Re:   Appraisal Report for Market Valuation Purposes for property located at:
      912 East 220th Street [Nathaniel Ajuwa]]
      Bronx, NY 10469
      Effective Date of the Appraised Value October 1, 2010

Dear Mr. Bassias

As requested, we have conducted an inspection of the above premises for the purpose of estimating the fair and reasonable market value of the fee simple estate as of October 1, 2010.  The purpose of this appraisal is to assist in a legal proceeding.

The subject premises consist of a fully attached 2 family brick home in average condition with 1,800 square feet of living area situated on a parcel of land measuring 2,160 sq. ft. The property is located on a quiet block in a section of Bronx County called "Williamsbridge". The overall real estate market in the neighborhood is depressed with many foreclosures and declining property values. There has been an overall estimated 30% decline in property values over the last 3 years.

---

### VALUATION

In our opinion, the fair and reasonable valuation of the subject premises as of September 20, 2010 is:

**THREE HUNDRED AND THIRTY FIVE THOUSAND [$335,000] DOLLARS**

---

Should you require any additional information, please do not hesitate to contact the undersigned.

Respectfully Submitted,

Michael Pavlakos
Senior Appraiser
NYS Certification #45-00005617
Expires 12/02/2011

2

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

| | |
|---|---|
| LOCATION: | 912 East 220th Street, Bronx, NY 10469 |
| COUNTY: | Bronx |
| ASSESSORS PARCEL #: | 2046900048 |
| SECTION VOLUME: | 1808 |
| BLOCK: | 4690 |
| LOT: | 48 |
| CENSUS: | 0501 |
| IMPROVEMENT: | 5 story attached brick urban row house |
| GROSS LIVING AREA: | 1,800 square feet |
| GROSS BASEMENT AREA: | 740 sq. ft. |
| FLOOD INFORMATION: | Zone X: (Not in a flood zone) Map Panel #360497-0104 09/05/2007 |
| ZONING INFORMATION: | R-4 MODERATE DENSITY RESIDENTIAL |
| OCCUPANCY: | Legal 2 family |

VALUE BY SALES COMPARISON APPROACH: $355,000

| | |
|---|---|
| VALUE BY COST APPROACH: | Not Applicable |
| VALUE BY INCOME APPROACH: | Not Applicable |
| FINAL ESTIMATE OF VALUE: | $355,000 |
| EFFECTIVE DATE OF VALUATION: | October 1, 2010 |

5

## IMPROVEMENT DESCRIPTION

| | |
|---|---|
| BUILT: | 1960 (+-) |
| FACADE: | Brick |
| EXTERIOR: | Brick |
| ROOF: | Flat-tar paper |
| WINDOWS: | Thermo pane |
| FOUNDATION: | Concrete & stone |

### MECHANICAL

| | |
|---|---|
| PLUMBING: | Copper & galvanized piping |
| HEATING: | Central Heating System/Gas/Circulating Hot Water |
| ELECTRIC: | 220 Volt-100 Amps |
| HOT WATER SUPPLY: | Boiler |

### LAYOUT

| | |
|---|---|
| BASEMENT: | Rec Room-Storage |
| FIRST FLOOR: | Living room, 1 bedroom, kitchen, 1 bath |
| SECOND FLOOR: | Living room, dining room, kitchen, 1/2 bath |
| THIRD FLOOR: | Bedrooms[3] 1 bath |

### CONDITION

As observed in the physical inspection conducted on October 1, 2010 it was noted that the dwelling was in typical average condition with semi-modern kitchens and bathrooms. No measureable deferred maintenance was observed, with the property appearing structurally sound.

# HIGHEST AND BEST USE

Essential to the concept of value is the theory of Highest and Best Use or most profitable use. The Appraisal Institute defines Highest and Best use as follows:

"The most profitable likely use to which a property can be put. The opinion of such use may be based on the highest and most profitable continuous use to which the property is adapted and needed or likely to be in demand in the reasonably near future. However, elements affecting value which while within the realm of possibility is not fairly shown to be reasonably probable should be excluded from consideration. Also if the intended use is dependent upon an uncertain act or another person the intention cannot be considered.

The use of land which may reasonably be expected to produce the greatest net return to land over a given period of time; the legal use which will yield to land the highest present value sometimes called optimum use."

In estimating "Highest and Best Use" there are essentially four considerations:

Possible Use:
To what uses is it physically possible to put the site in question.

Permissible Use:
What uses are permitted by zoning and deed restrictions on the site in question.

Feasible Use:
Which possible and permissible uses will produce the highest net return or highest present worth?

Maximally Productive Use:
Among the feasible uses which use will produce the highest net return or the highest present worth.

The Highest and Best Use of the land or site if vacant and available for use may be different from the Highest and Best Use of the improved property. This will be true when the improvement is not an appropriate use and yet makes a contribution to total property value in excess of the value of the site.

Since the appraisal of the subject property is based on a particular premise of use the highest and best use analysis determines just what this premise of use should be. A highest and best use analysis consists of considering the highest and best use of a property under two assumptions; with a vacant and available site and with the property as improved. These two assumptions on highest and best use are correlated into one final estimate of highest and best use.

5

## Land as if Vacant and Available

The physical characteristics of the site impose few development restrictions. Because of its size and shape the parcel has limited uses.

The legal restrictions applicable to the site consist of zoning regulations enforced by the local municipality. These regulations limit the site to residential use.

The immediate area consists of primarily residential and commercial properties with typical supporting commercial overlay. In this sense the subject property melds well with the other properties in the area.

If the site were vacant and available today the highest and best use would be for residential development.

## Property as Improved

The subject site was improved with a 1,800 square foot legal 2 family home. The current use of the property is permissible under the existing zoning ordinance.

The area surrounding the subject property is mixed residential/commercial. We considered all information pertaining to the physical characteristics of the site, including size, shape, access, topography and the availability of utilities. Based on a consideration of all pertinent data we have concluded that the subject site is physically suited for its present use.

After estimating the value of the subject land under the present use we considered whether any other uses which are physically possible, legally permissible, or financially feasible would support a higher land value.

We have concluded that the present use of the subject property is the use, which we considered to be maximally productive.

Given that the analysis meets the four criteria of Highest and Best Use, it is concluded that the use, which represents the Highest and Best Use of the subject property was that of its use on October 1, 2010.

# DEFINITION OF MARKET VALUE

The valuation set forth in this report is "market value", defined as the probable price in terms of money which a property will bring in a competitive and open market under all conditions requisite to a fair sale. Specifically, the purchaser and the seller are to each act prudently, knowledgeably, and that the agreed price is not affected by inappropriate stimulus, duress or motivation.

Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to purchaser under conditions whereby:

1) Buyer and seller are typically motivated.

2) Both parties are well informed or well advised; and each acts in what they consider being in their own best interests.

3) A reasonable amount of time is allowed for exposure in the open market.

4) Payment is made in cash or its equivalent.

5) Financing is on terms generally available in the community as of a specified date and typical for the property type in its locale.

6) The price represents an accepted consideration of the property sold unaffected by special financing amounts and/or terms, services, fees, costs or credits occurred in the transaction.

# THE APPRAISAL PROCESS

There are three traditional approaches that can be employed in establishing market value. These approaches generally referred to as the Sales Comparison Approach, the Cost Approach, and the Income Approach.

The Sales Comparison Approach: The Sales Comparison Approach is a set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, then applying appropriate units of comparison and making adjustments to the sales prices of the comparables based on the elements of comparison. The sales comparison approach may be used to value improved properties, vacant land, or land being considered as though vacant; it is most common and preferred method of land valuation when an adequate supply of comparable sales is available.

The Cost Approach: The Cost Approach is a set of procedures through which a value indication is derived for the fee simple interest in a property by estimating the current cost to construct a reproduction (or replacement for) the existing structure, including an entrepreneurial incentive, deducting depreciation from the total cost, and adding the estimated land value. Adjustments may then be made to the indicated fee simple value of the subject property to reflect the value of the property interest being appraised. The cost approach is not applicable to condominium units and therefore was not developed.

The Income Approach: The Income Capitalization Approach is a set of procedures through which as appraiser derives a value indication for an income-producing property by converting its anticipated benefits (cash flows and reversion) into property value. This conversion can be accomplished in two ways. One year's income expectancy can be capitalized at a market-derived capitalization rate or at a capitalization rate that reflects a specified income pattern, return on investment, and change in the value of the investment. Alternatively, the annual cash flows for the holding period and the reversion can be discounted at a specified yield rate. The cost approach is not applicable to condominium units and therefore was not developed.

Reconciliation: Reconciliation is the last phase of any valuation assignment in which two or more value indications derived from market data are resolved into a final value opinion, which may be either a final range of value or a single point estimate.

Since this assignment specifically calls for an estimate of market value of a typical residential dwelling for the subject area, the "Sales Comparison Approach", has been utilized and given most emphasis. Properties similar to the subject are typically valued by the sales comparison approach. Due to the lack of new construction and limited investment in residential dwellings, the cost approach and income approach are not considered reliable indicators of market value, and are therefore not utilized.

## THE SALES COMPARISON APPROACH

The Sales Comparison Approach relies upon an analysis of recent sales of similar properties and proves an indication, in theory, of what the subject property itself would sell for as of the date of valuation. Sales comparisons are reduced to a common unit rate, such as the price per square foot. The sales utilized in my analysis are very similar in terms of physical and location characteristics as compared to the subject property and could be considered excellent indicators of market value. After adjusting for differences in time, location, size and utility, these sales provide a range of value in which the subject property will fall.

In choosing comparable sales, the appraiser focused upon similar brick urban row houses of vintages similar to our 20 year old subject property within the subject market area with comparable use and, to the degree possible, comparable size. The property rights conveyed were on a Fee Simple basis.

A careful investigation of the market revealed (3) sales the appraiser deemed to be comparable to the subject. The comparable sales were analyzed on a price per square foot of gross living area and compared to the subject property for differences in date of sale, location, building size, land/building ratio, physical characteristics and amenities.

The following is a summary of the salient features for the comparable sales selected.

| COMPARABLE SALE #1 | |
|---|---|
| LOCATION: | 1051 East 220th Street, Bronx, NY 10469 |
| PROXIMITY: | .23 Miles |
| UNIT SIZE: | 1,800 Square Foot-Legal Two Family |
| ROOMS / BATH(S): | (9) Rooms, (4) Bedrooms, and (2.5) Bathrooms |
| SELLING PRICE: | $339,000 |
| TRANSFER DATE: | 2/20/2010 |
| SELLING PRICE PER SQUARE FOOT: | $188.54 |
| DATA SOURCE REFERENCES/ COMMENTS | Geodata Plus Inc. This was a similar-style home in average condition |

| COMPARABLE SALE #2 | |
| --- | --- |
| LOCATION: | 4058 Bronxwood Avenue, Bronx, NY 10469 |
| PROXIMITY: | .42 Miles |
| UNIT SIZE: | 1,500 Square Foot-Legal Two Family |
| ROOMS / BATH(S): | (9) Rooms,(4) Bedrooms, and (2.5) Bathrooms |
| SELLING PRICE: | $325,000 |
| TRANSFER DATE: | 1/21/2010 |
| SELLING PRICE PER SQUARE FOOT: | $216.67 |
| DATA SOURCE REFERENCES/ COMMENTS | Geodata Plus Inc. This was a smaller home in good condition |

| COMPARABLE SALE # 3 | |
| --- | --- |
| LOCATION: | 1023 East 218th, Bronx, NY 10469 |
| PROXIMITY: | .17 Miles |
| UNIT SIZE: | 2,200 Square Foot-Legal Two Family |
| ROOMS / BATH(S): | (12) Rooms,(6) Bedrooms, and (5) Bathrooms |
| SELLING PRICE: | $350,000 |
| TRANSFER DATE: | 6/21/2010 |
| SELLING PRICE PER SQUARE FOOT: | $159.09 |
| DATA SOURCE REFERENCES/ COMMENTS | Geodata Plus Inc. This was a larger home in similar condition |

# COST APPROACH

Please note that the subject property is a "typical" condominium unit for the subject area. There is ample verifiable supporting sales data. The "Direct Sales Comparison Approach" can therefore most effectively ascertain the overall marketability of the subject property. The "Cost Approach" is therefore considered "not applicable".

Due to the lack of residential new construction, and the scarcity of available building lots in the subject area, the "Cost Approach" is not considered a valid indicator of market Value, and was not considered in this report.

## INDICATED VALUE BY THE COST APPROACH

Not Applicable

# THE INCOME APPROACH

The underlying assumption of the Income Approach is that the typical, prudent purchaser will pay no more for a property than the interest. The value is derived through the capitalization process. This estimate is based upon an analysis of the property's potential net revenue flow:

The following is the methodology applicable in this approach:

1) The projection of the potential income from all sources which a competent owner or manager may legally generate from the realty over a specific or estimated period of time,

2) An estimate of vacancy and bad debts, as well as expenses incurred in the operation of the realty. These deductions, subtracted from the potential gross income, result in a stabilized net operating income.

3) The development of an overall rate. This includes the weighted affect of a percentage return to the equity position, the weighted effect of the debt service and the present worth of the future disposition or refinancing of the realty,

4) The overall rate, when divided into the net operating income, produces the final estimates of value

Properties similar to the subject are typically not traded for their income potential. The "Income Approach" was therefore not considered to be a statistically viable indicator of value, and is consequently not utilized in this report.

## INDICATED VALUE BY THE INCOME APPROACH

Not Applicable

## RECONCILIATION OF VALUE

In the previous sections of this appraisal report, the three approaches to estimate value have been considered, utilized, and emphasized as they apply to the fee simple of the ownership of the subject property and these indicated values are:

| | |
|---|---|
| Market Data/Direct Sales Comparison | $335,000 |
| Cost Approach | Not Applicable |
| Income Approach | Not Applicable |

Since this assignment calls for the appraisal of a typical residential 2 family home, the Direct Sales Comparison Approach was given most emphasis. Supporting sales were deemed to be comparable to the subject property were ascertained. Adjustments were made to these market supporting comparable sales for any differences between them and the subject property. All comparable sales were visited and adjusted where necessary for value influencing characteristics such as location, condition, and size. Once reconciled, these comparables provided reliable insight as to the subject's market value.

The Cost Approach was considered as "not applicable" as the subject property is typical to the area. There is ample supporting market data consequently making it inappropriate to place any emphasis on the cost approach.

The Income Approach was considered "not applicable". These types of properties are not typically purchased for their rent potential to an investor.

Assumptions made in the comparable market analysis were both reasonable and consistent. It is our opinion that the analysis yielded an estimate which best represents the Market Value of the subject property as previously defined in this report.

It is our judgment and opinion that the Market Value of the subject property as of October 1, 2010 is:

### THREE HUNDRED AND THIRTY FIVE THOUSAND DOLLARS
### $335,000

Michael Pavlakos
Senior Appraiser
NYS Certification #45-00005617
Expires 12/02/2011

# ADDENDUM SECTION









## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to do it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser may have provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in questions, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property.
The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must NOT be considered as any type environmental assessment or property inspection of the property

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers being reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser may have based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identify and professional designations, and references to any professional appraisal organizations of the firm with which the appraiser is associated) to anyone other than the borrower, the mortgage of its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department agency, or instrumentality of the United States or any state of the District Of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service (s) without having to obtain the appraiser's prior written consent.
The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

**APPRAISER'S CERTIFICATION:** The appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a NEGATIVE adjustment is made to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a POSITIVE adjustment is made to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and, I, believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report predetermined value or direction in value that favors the cause of the client or any related party, the amount of value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of these Standards, which does not apply (unless specifically stated so). I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise state in the reconciliation section.

8. I have personally inspected the *exterior only* areas of the subject property, and the exterior of all

properties listed as comparables in the appraisal report (unless otherwise indicated). I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal of the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I take no responsibility for it.

Michael Pavlakes, as president

21



The Real Estate Valuation & Inspection Specialists

Email: info@eastcoastappraisal.com
TOLL FREE-800-228-2158 FAX 718-854-5867

# MICHAEL G. PAVLAKOS-UNIFIED COURT SYSTEM FIDUCIARY SPECIAL ID #280774

## QUALIFICATIONS PROFILE

Michael G. Pavlakos is a New York State Certified Real Estate Appraiser who has been preparing real estate appraisals for the legal profession for over sixteen years. Many of these assignments were performed in the capacity as neutral appraiser court appointed by the New York State Supreme Court from Supreme Court Justices in the five Boro's, Nassau, Suffolk and Westchester Counties. These assignments ranged from small residential properties to large, complex industrial properties prepared on properties located on a local, national and international level.

## EXPERIENCE

**1991-PRESENT**     East Coast Appraisal Service          Brooklyn, NY
*President, Senior Appraiser*
- Responsible for appraiser performance and quality control on all assignments prepared on behalf of the State of New York's Unified Court System in the five Boro's of New York, Nassau, Suffolk and Westchester Counties.
- Senior Appraiser responsible for the quality and integrity of all residential and commercial appraisals prepared for some of the country's leading mortgage lenders.
- Coordinate and supervise all national and international appraisal assignments.

**1986-1991**     Appraisal Advocates          Brooklyn, NY
*Managing Director, Partner*
- Operations Manager supervising and coordinating appraisal assignments.
- Senior Review Appraiser and Quality Control Manager overseeing a staff of fifteen real estate appraisers.

**1983-1986**     Vardakis Associates          Brooklyn, NY
*Senior Real Estate Appraiser & Trainer*
- Appraised over 1,500 residential and commercial properties.
- Instructed and trained staff both in the field and in the office in the preparation of professional real estate appraisal reports.

## EDUCATION

**1997**     New York University          New York, NY
- Graduate, Degree in Liberal Arts

- The Real Estate Institute (Real Estate and Property Appraisals)
  Examinations Passed.
  - Course S-1 -Principals of Real Estate Appraisals. [Appraisal Institute/1984]
  - Course S-2 -Residential Valuation [Appraisal Institute/1984]
  - Course S-3 -Standards of Professional Practice [Appraisal Institute/1985]
  - Market Data Analysis of Residential Real Estate [6/91] N.A.I.F.A.
  - Residential Report Writing [8/91] N.A.I.F.A.

- Course R61- Insp/Eval Property Physical Condition [NYU 11/2004]
- Course N62- Ethics/ Standards USPAP [NYU 11/2004]

PROFESSIONAL AFFILIATIONS
- Member, American Society of Appraisers [ASA]
- Member, Appraiser's Guild of the Office and Professional Employees International Union/OPEIU/AFL-CIO

REFERENCES AVAILABLE UPON REQUEST

AFFIRMATION OF SERVICE

GEORGE BASSIAS, AN ATTORNEY duly admitted to practice law in New York

affirms under penalty of perjury:

On November 12, 2010, I mailed a hard copy of the within motion to the

following:

HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE
ROOM 610
ALEXANDER HAMILTON CUSTOM HOUSE
ONE BOWLING GREEN
NEW YORK, NY 10004

RENE MYATT
ATTORNEY FOR SEAN HILL
204-04 HILLSSIDE AVE., SECOND FLOOR
HOLLIS, NY 11423

JEFFREY SAPIR, ESQ.
399 KNOLLWODD ROAD
WHITE PLAINS, NY 10603

UNITED STATES TRUSTEE
SOUTHERN DISTRICT OF NEW YORK
ONE BOWLING GREEN
NY, NY 10004

Dated: Queens, NY
        November 12, 2010

_____
George Bassias

**EXHIBIT F – Chapter 13 Plan**

## United States Bankruptcy Court
### Southern District of New York

In re    Nathaniel Ajunwa
     Regina Ajunwa                                    Case No.    **10-15981**

                                       Debtor(s)            Chapter       **13**

## CHAPTER 13 PLAN

1. <u>Payments to the Trustee:</u> The future earnings or other future income of the Debtor is submitted to the supervision and control of the trustee. The Debtor (or the Debtor's employer) shall pay to the trustee the sum of **$40.52** per month for **60** months.

   Total of plan payments: **$2,431.20**

2. <u>Plan Length:</u> This plan is estimated to be for 60 months.

3. Allowed claims against the Debtor shall be paid in accordance with the provisions of the Bankruptcy Code and this Plan.

   a. Secured creditors shall retain their mortgage, lien or security interest in collateral until the earlier of (a) the payment of the underlying debt determined under nonbankruptcy law, or (b) discharge under 11 U.S.C. § 1328.

   b. Creditors who have co-signers, co-makers, or guarantors ("Co-Obligors") from whom they are enjoined from collection under 11 U.S.C. § 1301, and which are separately classified and shall file their claims, including all of the contractual interest which is due or will become due during the consummation of the Plan, and payment of the amount specified in the proof of claim to the creditor shall constitute full payment of the debt as to the Debtor and any Co-Obligor.

   c. All priority creditors under 11 U.S.C. § 507 shall be paid in full in deferred cash payments.

4. From the payments received under the plan, the trustee shall make disbursements as follows:

   a. Administrative Expenses
   (1) Trustee's Fee: **10.00**%
   (2) Attorney's Fee (unpaid portion): **NONE**
   (3) Filing Fee (unpaid portion): **NONE**

   b. Priority Claims under 11 U.S.C. § 507

   (1) Domestic Support Obligations

   (a) Debtor is required to pay all post-petition domestic support obligations directly to the holder of the claim.

   (b) The name(s) and address(es) of the holder of any domestic support obligation are as follows. See 11 U.S.C. §§ 101(14A) and 1302(b)(6).

   **-NONE-**

   (c) Anticipated Domestic Support Obligation Arrearage Claims. Unless otherwise specified in this Plan, priority claims under 11 U.S.C. § 507(a)(1) will be paid in full pursuant to 11 U.S.C. § 1322(a)(2). These claims will be paid at the same time as claims secured by personal property, arrearage claims secured by real property, and arrearage claims for assumed leases or executory contracts.

   | Creditor (Name and Address) | Estimated arrearage claim | Projected monthly arrearage payment |
   |---|---|---|
   | -NONE- | | |

   (d) Pursuant to §§ 507(a)(1)(B) and 1322(a)(4), the following domestic support obligation claims are assigned to, owed to, or recoverable by a governmental unit.

   Claimant and proposed treatment:    **-NONE-**

(2) Other Priority Claims.

| Name | Amount of Claim | Interest Rate (If specified) |
|---|---|---|
| -NONE- | | |

c.    Secured Claims

(1) Pre-Confirmation Adequate Protection Payments.  Pre-confirmation adequate protection payments to the following Creditors holding allowed claims secured by a purchase money security interest in personal property shall be paid by the Trustee through the plan as provided below.  Adequate protection payments shall not accrue or be paid until the Creditor files a proof of claim.  The principal amount of the Creditor's claim shall be reduced by the amount of the adequate protection payments remitted.

| Name | Description of Collateral | Pre-Confirmation Monthly Payment |
|---|---|---|
| -NONE- | | |

(2) Secured Debts Which Will Not Extend Beyond the Length of the Plan

(a) Secured Claims Subject to Valuation Under § 506.  The Debtor moves the Court to value collateral as follows according to 11 U.S.C. § 506(a).  Each of the following secured claims, if allowed, shall be paid through the plan in equal monthly payments set forth below, until the secured value or the amount of the claim, whichever is less, has been paid in full.  Any remaining portion of the allowed claim shall be treated as a general unsecured claim.  Any claim with a secured value of $0 shall be treated as a general unsecured claim.

| Name | Proposed Amount of Allowed Secured Claim | Monthly Payment | Interest Rate (If specified) |
|---|---|---|---|
| -NONE- | | | |

(b) Secured Claims Not Subject to Valuation Under § 506.  Each of the following claims, if allowed, shall be paid through the plan in equal monthly payments set forth below, until the amount of the claim as set forth in the Creditor's proof of claim has been paid in full.

| Name | Proposed Amount of Allowed Secured Claim | Monthly Payment | Interest Rate (If specified) |
|---|---|---|---|
| -NONE- | | | |

(3) Secured Debts Which Will Extend Beyond the Length of the Plan

| Name | Amount of Claim | Monthly Payment | Interest Rate (If specified) |
|---|---|---|---|
| -NONE- | | | |

d.    Unsecured Claims
(1) Special Nonpriority Unsecured: Debts which are co-signed or are non-dischargeable shall be paid in full (100%).

| Name | Amount of Claim | Interest Rate (If specified) |
|---|---|---|
| -NONE- | | |

(2) General Nonpriority Unsecured: Other unsecured debts shall be paid **1** cents on the dollar and paid pro rata, with no interest if the creditor has no Co-obligors, provided that where the amount or balance of any unsecured claim is less than $10.00 it may be paid in full.

5.   The Debtor proposes to cure defaults to the following creditors by means of monthly payments by the trustee:

| Creditor | Amount of Default to be Cured | Interest Rate (If specified) |
|---|---|---|
| -NONE- | | |

6.   The Debtor shall make regular payments directly to the following creditors:

| Name | Amount of Claim | Monthly Payment | Interest Rate (If specified) |
|---|---|---|---|
| Citimortgage, Inc. | 170,000.00 | 0.00 | 0.00% |

7.   The employer on whom the Court will be requested to order payment withheld from earnings is:
**NONE.  Payments to be made directly by debtor without wage deduction.**

8. The following executory contracts of the debtor are rejected:

      Other Party                                    Description of Contract or Lease
      **-NONE-**

9. Property to Be Surrendered to Secured Creditor

      Name                                      Amount of Claim     Description of Property
      **-NONE-**

10. The following liens shall be avoided pursuant to 11 U.S.C. § 522(f), or other applicable sections of the Bankruptcy Code:

| Name | Amount of Claim | Description of Property |
|---|---|---|
| SEAN HILL | 160,000.00 | JURY VERDICT AND POTENTIAL JUDGMENT IN MOTOR VEHICLE ACCIDENT |

11. Title to the Debtor's property shall revest in debtor **on confirmation of a plan.**

12. As used herein, the term "Debtor" shall include both debtors in a joint case.

13. Other Provisions:

Date  **November 4, 2010**               Signature   **/s/ Nathaniel Ajunwa**
                                                        **Nathaniel Ajunwa**
                                                           Debtor

Date  **November 4, 2010**               Signature   **/s/ Regina Ajunwa**
                                                            **Regina Ajunwa**
                                                            Joint Debtor

**EXHIBIT G – Affidavit of Service**

# AFFIDAVIT OF SERVICE

State of New York      )
County of _Queens_    )

The undersigned being duly sworn, deposes and says:

_ANN ROLDAN_ is not a party to the action, is over
(name of person serving papers)

18 years of age and reside at _____

_1615 FULTON STREET BROOKLYN, NY 11213_
(complete address of person serving papers)

That on _OCTOBER 30, 2010 @ 11:49 AM_, deponent served the within

_JUDICIAL SUBPOENA INDEX # 024874/2007_
(name of document[s] served`

upon _NATHANIEL AJUNWA (FOR) REGINA AJUNWA_ located at
(name of person/corporation served)

_912 EAST 220TH STREET BRONX, NY 10469_.
(complete address where other party/corporation served)

(Select method of service)

_X_ Personal Service: by delivering a true copy of the aforesaid documents personally;
deponent knew said person/corporation so served to be the person/corporation described.

____ Service by Mail: by depositing a true copy of the aforesaid documents in a postpaid
properly addressed envelope in a post office or official depository under the exclusive care
and custody of the United States Postal Service.

_Ann Roldan lic# 1137105_
Signature of person serving papers

_Ann Roldan_
Printed Name

Sworn to before me this _3_

day of _January 2011_

_Donah V. Guy_
Notary Public

Loretta V. Guy
Notary Public, State of New York
No. 01GU6154942
Qualified in Queens County
Commision Expires Oct. 23, 20_14_

# AFFIDAVIT OF SERVICE

State of New York       )
County of _Queens_     )

The undersigned being duly sworn, deposes and says:

__ANN ROLDAN_____ is not a party to the action, is over
     (name of person serving papers)

18 years of age and reside at _____

_____1615 FULTON STREET BROOKLYN, NY 11213_____
          (complete address of person serving papers)

That on __OCTOBER 30, 2010 @ 11:45 AM_____, deponent served the within

_____JUDICIAL SUBPOENA INDEX # 024874/2007_____
         (name of document[s] served)

upon _____ NATHANIEL AJUNWA_____ located at
         (name of person/corporation served)

_____912 EAST 220TH STREET BRONX, NY 10469_____ .
       (complete address where other party/corporation served)

(Select method of service)

__X__ Personal Service: by delivering a true copy of the aforesaid documents personally;
deponent knew said person/corporation so served to be the person/corporation described.

_____ Service by Mail: by depositing a true copy of the aforesaid documents in a postpaid
properly addressed envelope in a post office or official depository under the exclusive care
and custody of the United States Postal Service.

                               _lic # 1137105_

                          Signature of person serving papers

                          ANN Roldan
                          Printed Name

Sworn to before me this _3_

day of _January 2011_

_____
Notary Public

Loretta V. Guy
Notary Public, State of New York
No. 01GU6154942
Qualified in Queens County
Commission Expires Oct. 23, 20 _14_

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK     )
COUNTY OF QUEENS    ) ss.:

I, Kenny Milord being duly sworn deposes and says:

I am not a party to this action, am over 18 years of age and reside in Nassau, New York.

On January 7, 2011 I served the within **AFFIRMATION IN OPPOSITION** by depositing a true copy thereof in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, addressed to each of the following persons at the last known address set forth after each name:

TO:    GEORGE BASSIAS, ESQ.              HONORABLE SHELLEY C. CHAPMAN
        Attorney for Debtors                  United States Bankruptcy Judge
        21-83 Steinway Street                Alexander Hamilton Custom House
        Astoria, New York 11105            One Bowling Green – Room 610
        (718) 721-4441                      New York, New York 10004

        JEFFREY SAPIR, ESQ
        Chapter 13 Trustee
        399 Knollwood Road, Suite 102
        White Plains, New York 10603
        (914) 328-6333

        UNITED STATES TRUSTEEE
        SOUTHERN DISTRICT OF NEW YORK
        One Bowling Green
        New York, New York 10004

                                                Kenny Milord

Sworn to before me this
7 day of January      2011

Notary Public
**RENE MYATT**
*NOTARY PUBLIC, State of New York*
*No. 02MY6041652*
*Qualified in Queens County*
*Commission Expires May 8, 20 14*

       Stamp/Seal

9